**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------**X**
MADELAINE CHOCOLATE NOVELTIES, INC.
D/B/A THE MADELAINE CHOCOLATE
COMPANY,

               Plaintiff,

vs.                                    Case No. 1:15-cv-05830-RJD-SMG

GREAT NORTHERN INSURANCE COMPANY,

               Defendant.

-------------------------------------------------------------**X**


## MEMORANDUM OF LAW OF GREAT NORTHERN INSURANCE COMPANY IN SUPPORT OF ITS RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT

MOUND COTTON WOLLAN & GREENGRASS LLP
Philip C. Silverberg (PS 8110)
Hilary M. Henkind (HH 5801)
One New York Plaza, 44th Floor
New York, NY 10004
Phone: (212) 804-4257
Facsimile: (212) 344-8066


-and-


COZEN O'CONNOR
A Pennsylvania Professional Corporation
Thomas McKay, III (TM 9676)
Richard Mackowsky (RM 6426)
(admitted *pro hac vice*)
Melissa Brill (MB 4374)
Charles J. Jesuit (CJ 9977)
(admitted *pro hac vice*)
45 Broadway, 16th Floor
New York, New York 10006
Phone:  (212) 509-9400
Facsimile:  (866) 825-3144

## TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................................. ii

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF ADDITIONAL UNDISPUTED FACTS ....................................................... 4

ARGUMENT .............................................................................................................................. 4

I.     THE WINDSTORM DEDUCTIBLE ENDORSEMENT IS NOT A COVERAGE
        GRANT AND, THEREFORE, THE FLOOD EXCLUSION AND THE
        WINDSTORM DEDUCTIBLE ENDORSEMENT DO NOT CONFLICT. .................... 4

        A.    The Flood Exclusion Clearly and Unambiguously Excludes Storm Surge. ........... 5

        B.    The Windstorm Deductible Endorsement is Not a Grant of Coverage. ................ 6

        C.    The Windstorm Deductible Endorsement Does Not Come Into Play
             Where, As Here, the Loss is Caused by an Excluded Peril. ................................ 13

II.    APPLYING THE DEFINITION OF "WINDSTORM" IN THE
       ENDORSEMENT TO THE ENTIRE POLICY DOES NOT ALTER THE
       CONCLUSION THAT THE FLOOD EXCLUSION UNAMBIGUOUSLY
       PRECLUDES COVERAGE FOR STORM SURGE DAMAGE. .................................. 15

III.   EXTRINSIC EVIDENCE DEMONSTRATES THAT MADELAINE HAD NO
      REASONABLE EXPECTATION OF RECEIVING FLOOD COVERAGE. ................. 17

        A.    Madelaine Declined to Purchase Flood Coverage. ................................................ 18

        B.    Great Northern Did Not Intend to Eviscerate the Flood Exclusion in its
             Policy by Including the Windstorm Deductible Endorsement. .......................... 21

CONCLUSION ........................................................................................................................ 22

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

1070 Park Ave. Corp. v. Fireman's Fund Ins. Co.,
    313 F. Supp. 3d 528 (S.D.N.Y. 2018)................................................................8, 20

ACE American Ins. Co. v. Administrators of the Tulane Educational Fund,
    No. 07-cv-3749, 2008 WL 4091013 (E.D. La. Aug. 29, 2008)..........................11, 12

Arctic Slope Regional Corp. v. Affiliated FM Ins. Co.,
    564 F.3d 707 (5th Cir. 2009) ..............................................................................14, 15

Bozek v. Erie Ins. Group,
    46 N.E.3d 362 (Ill. App. 2015) ................................................................................12

Haber v. St. Paul Guardian Ins. Co.,
    137 F.3d 691 (2d Cir. 2013).....................................................................................18

IBM Poughkeepsie Employees Federal Credit Union v. Cumis Ins. Soc'y, Inc.,
    590 F. Supp. 769 (S.D.N.Y. 1984) ............................................................................8

In Re Katrina Canal Breaches Litigation,
    495 F.3d 222 (5th Cir. 2007) ..............................................................................10, 12

Lightfoot v. Union Carbide Corp.,
    110 F.3d 898, 906 (2d Cir. 1997)..............................................................................18

Madelaine Chocolate Novelties, Inc. v. Great Northern Ins. Co.,
    752 Fed. Appx. 47 (2d Cir. 2018).........................................................4, 10, 16, 18

Mercury Partners LLC v. Pacific Medical Buildings, L.P.,
    No. 02-cv-6005, 2007 WL 2197830 (S.D.N.Y. Jul. 31, 2007).................................8

Nat'l R.R. Passenger Corp. v. Aspen Specialty Ins. Co.,
    661 Fed. Appx. 10 (2d Cir. 2016)..............................................................................6

New Sea Crest Health Care Ctr., LLC v. Lexington Ins. Co.,
    No. 12-CV-6414(RJD)(RLM), 2014 WL 2879839 (E.D.N.Y. June 24, 2014) ......................6

Newmont Mines, Ltd. v. Hanover Ins. Co.,
    784 F.2d 127 (2d Cir.1986)........................................................................................8

Penthouse Owners Ass'n, Inc. v. Certain Underwriters at Lloyds, London,
    612 F.3d 383 (5th Cir. 2010) ..............................................................................9, 10, 14

Preferred Mut. Ins. Co. v. Meggison,
   53 F. Supp. 2d 139 (D. Mass. 1999) ........................................................................12

Seiden Assocs., Inc. v. ANC Holdings, Inc.,
   959 F.2d 425, 428 (2d Cir. 1992)............................................................................18

Shaw Group, Inc. v. Triplefine Int'l Corp.,
   322 F.3d 115 (2d Cir. 2003)......................................................................................8

**Other Authorities**

Recent Developments in Prop. Ins. Law, 33 Tort & Ins. L.J. 659 (Winter, 1993) ........................12

LEGAL\40772729\3

## INTRODUCTION

Plaintiff, Madelaine Chocolate Novelties, Inc., d/b/a The Madelaine Chocolate Company ("Plaintiff" or "Madelaine") commenced this action against defendant Great Northern Insurance Company ("Great Northern") seeking coverage for Storm Sandy flood damage to its three buildings located in Far Rockaway, New York.[1]  By Order dated September 26, 2017, this Court granted summary judgment in favor of Great Northern, concluding that the Flood exclusion contained in the Great Northern property insurance policy issued to Madelaine unambiguously precluded coverage for the storm surge flood damage to Madelaine's buildings.  (ECF No. 31.) On appeal, the U.S. Court of Appeals for the Second Circuit issued a Summary Order on October 23, 2018, vacating the District Court's judgment and remanding the matter for further proceedings. This memorandum[2] on behalf of Great Northern focuses on the narrow issues identified for resolution by the Second Circuit in its October 23, 2018 Summary Order:

> Mainly, the Windstorm Endorsement contains a separate "Definitions" section that explicitly adds an ACC clause to the definition of "windstorm" for the entire Policy. . . . On remand, the District Court must assess whether the Windstorm Endorsement's ACC clause conflicts with, or otherwise creates an ambiguity *vis-à-vis*, the Policy's Flood Exclusion.

---

[1] Great Northern already has paid a total of $3,951,877.26 to Madelaine for wind and rain damage to Madelaine's three buildings and to data processing equipment.  ECF No. 22-3, footnote 2, at PageID #:482.  Those damages are not at issue in this litigation.  The parties have agreed since the outset of this litigation that, should there ultimately be a final determination that there is coverage under the Great Northern policy for Madelaine's claim, the issue of the quantum of Madelaine's loss would be submitted to Great Northern for an adjustment process. This litigation would then only continue as necessary to resolve any disputes that might arise between the parties concerning the amount of Madelaine's loss.  *See* Madelaine's Memorandum of Law in Support of its Motion for Summary Judgment Regarding the Policy's Coverage, ECF No. 23-3, footnote 1, at PageID #: 723; and Report and Recommendation of U.S. Magistrate Judge Gary R. Brown, ECF No. 25, footnote 1, at PageID#: 2065.

[2] Great Northern Insurance Company ("Great Northern") incorporates by reference its Memorandum of Law in Support of its Cross-Motion for Summary Judgment ECF No. 22-3, PageID #: 477-505 and Defendant's Statement of Undisputed Material Facts. ECF No. 22-4, PageID #: 506-17, and supporting affidavits with exhibits, ECF Nos. 22-1 and 22-2. This renewed cross-motion for summary judgment is further supported by Defendant's Supplemental Statement of Undisputed Material Facts and supporting affidavit of Thomas McKay, Esq., pursuant to Federal Rule of Civil Procedure 56(c) and Local Civil Rule 56.1.

For the following reasons, after further discovery, it remains clear, as a matter of law, that the anti-concurrent causation ("ACC") clause in the Windstorm Or Hail Deductible Or Waiting Period Endorsement (form 80-02-1324 (Rev. 10-06))[3] neither conflicts with, nor otherwise creates any ambiguity *vis-à-vis*, the Flood exclusion in the Great Northern policy (the "Policy").[4]

First, there is no conflict or ambiguity between the ACC clauses in the Flood exclusion and windstorm deductible endorsement. The two provisions serve separate and distinct functions in the Policy. The ACC clause in the Flood exclusion serves to make clear that there is no coverage for a loss or damage caused by "waves, tidal water or tidal waves; or rising, overflowing or breaking of any boundary, of any . . .oceans or any other body of water . . .whether driven by wind or not" even if another covered cause contributes concurrently or in any sequence to the loss or damage. In contrast, the purpose of the ACC clause in the windstorm deductible endorsement is to ensure that, *if a covered cause of loss has occurred*, the higher deductible and longer waiting period will apply where "windstorm," as defined in the windstorm deductible endorsement, contributes concurrently or in any sequence to that *covered* loss or damage.

The Policy's coverage grant, which governs whether or not coverage is afforded for a particular loss, provides that Great Northern will pay for direct physical loss or damage to building or personal property caused by or resulting from a peril *not otherwise excluded*. Where, as here, the cause of loss (flood) is excluded, the windstorm deductible endorsement is not relevant because there is no covered loss and no obligation for the insurer to make any payment. In this case,

---

[3] Madelaine consistently refers to the name of the endorsement as the "windstorm endorsement," a label designed to mislead the reader by suggesting that it is an endorsement granting windstorm coverage when it simply is a deductible provision.  Great Northern will refer herein to the endorsement either as the "windstorm deductible endorsement" or "the endorsement."

[4] A true and complete copy of the Policy at issue (November 12, 2011 to November 12, 2012) was designated Plaintiff's *Exhibit 1* to the Affidavit of Jason Lissy filed along with Plaintiff's initial Motion for Summary Judgment. ECF No. 23-5, PageID #: 754-1081. For ease of reference citations to the 2011-2012 policy forms or particular pages in this brief will be to "PageID # 754," etc.

2

Madelaine asks this Court to turn this customary practice and the general understanding of both insurers and commercial insureds on its head by incorrectly claiming that the windstorm deductible endorsement is a grant of coverage. It is not.

Second, applying the definition of "windstorm" set forth in the windstorm deductible endorsement to the entire Policy -- as suggested by the Second Circuit -- does not negate the application of the Flood exclusion to Madelaine's loss nor render the Flood exclusion ambiguous. In this regard, the Policy's insuring agreement does not refer to the peril of "windstorm," and the Policy's limited references to the term "windstorm" are irrelevant to Madelaine's current insurance claim because they do not impact the scope of coverage afforded under the Policy.

Third, the extrinsic evidence gathered during discovery after remand refutes Madelaine's attempt to convert the windstorm deductible endorsement into policy-limits flood coverage.[5]  In particular, from at least 1996 to 2001 Madelaine had purchased $2.5 million in excess flood coverage from Great Northern.[6]  During the 2001-2002 policy renewal, Madelaine made a business decision to drop the flood coverage because it believed that the cost to obtain that $2.5 million in excess flood coverage was too expensive.  It defies logic to suggest that the inclusion of a windstorm deductible somehow converts the Policy into one that provides over $50 million in flood coverage with no concomitant increase in premium.  Additionally, a Great Northern corporate witness testified that the windstorm deductible endorsement is included only in those policies where there is an increased wind risk.  Ironically, had Great Northern chosen to keep the Policy's $25,000 windstorm deductible in the main policy form rather than increasing the

---

[5] The Great Northern policy limit for property damage coverage is a blanket limit of $59,950,000 with a standard deductible of $25,000 and $15,500,000 for business income loss. [PageID #: 775-76.]

[6] Madelaine had purchased -- and continues to purchase -- primary flood coverage for the three buildings from NFIP insurers.  (SSUF ¶¶ 32, 35.)

deductible to $50,000 for windstorm losses, Madelaine would not have been able to rely on the "windstorm" definition in the windstorm deductible endorsement in making an argument that it is entitled to $50 million in flood coverage.

The only reasonable interpretation of the Policy language, when reading the Policy as a whole -- as this Court must under New York law -- is that the sole purpose of the windstorm deductible endorsement is, as its name reflects, to amend the standard deductible and waiting period for *covered* losses that arise in a windstorm or hail event as defined in the endorsement.[7] Discovery has revealed no evidence supporting any alternative interpretation. No language in the windstorm deductible endorsement grants or extends coverage or eliminates any of the Policy's exclusions, including the Flood exclusion.   Accordingly, the Flood exclusion precludes Madelaine's storm surge loss and the windstorm deductible endorsement does not serve to provide flood coverage.

<u>**STATEMENT OF ADDITIONAL UNDISPUTED FACTS**</u>

Great Northern incorporates its Supplemental Statement of Undisputed Material Facts herein by reference.

<u>**ARGUMENT**</u>

**I.      THE WINDSTORM DEDUCTIBLE ENDORSEMENT IS NOT A COVERAGE GRANT AND, THEREFORE, THE FLOOD EXCLUSION AND THE WINDSTORM DEDUCTIBLE ENDORSEMENT DO NOT CONFLICT.**

The Second Circuit remanded this case with explicit instructions to "assess whether the Windstorm Endorsement's ACC clause conflicts with, or otherwise creates an ambiguity vis-à-vis,

---

[7] The Policy conditions provide that "[t]he titles of the various paragraphs of this policy and endorsements, if any, attached to this policy are inserted solely for convenience or reference and are not to be deemed in any way to limit or affect the provisions to which they relate."  [PageID #: 1047.]  Nonetheless, the title of the endorsement does accurately reflect the purpose of the endorsement -- to change the deductible in the event of a windstorm or hail event -- and thus serves as convenient reference for an insured seeking to confirm the applicable deductible in the event of a windstorm or hail loss.

the policy's Flood Exclusion." <u>Madelaine Chocolate Novelties, Inc. v. Great Northern Ins. Co.</u>, 752 Fed. Appx. 47, 50 (2d Cir. 2018) (summary order).   The Flood exclusion clearly and unambiguously excludes storm surge, while the windstorm deductible endorsement provides a higher deductible in the event a covered cause of loss is caused by "windstorm."  Where, as here, the loss is not covered, *i.e.*, it is excluded under the Flood exclusion, the two provisions easily can be read harmoniously and do not conflict.

### A.   The Flood Exclusion Clearly and Unambiguously Excludes Storm Surge.

The insuring agreement of the Building and Personal Property ("BPP") form of the Policy provides that Great Northern will "pay for direct physical loss or damage to: **building**; or **personal property**, caused by or resulting from a peril not otherwise excluded…." [PageID #: 789.] The BPP form also contains a number of exclusions, including the following Flood exclusion:

> *Flood*[8]
>
> This insurance does not apply to loss or damage caused by or resulting from:
>
> - waves, tidal water or tidal waves; or
>
> - rising, overflowing or breaking of any boundary,
>
> of any natural or man-made lakes, reservoirs, ponds, brooks, rivers, streams, harbors, oceans or any other body of water or watercourse, whether driven by wind or not, regardless of any other cause or event that directly or indirectly:
>
> - contributes concurrently to; or
>
> - contributes in any sequence to,
>
> the loss or damage, even if such other cause or event would otherwise be covered.

---

[8] The word "flood" is also defined the same way in the Definitions section of the Property/Business Income Conditions and Definitions form. [PageID #: 889.]

> This Flood exclusion does not apply to ensuing loss or damage caused by or resulting from a **specified peril.**

[PageID #: 805.]

Madelaine does not dispute that the Flood exclusion, standing alone, precludes coverage for loss or damage caused by coastal or storm surge flooding. *See* ECF No. 23-3, Madelaine Memorandum of Law in Support of Summary Judgment ("Mad. MOL") at 1-3, PageID#: 723-25. Indeed, Courts in this Circuit recognize that storm surge is a type of "flood." <u>See</u>, <u>e.g.</u>, <u>Nat'l R.R. Passenger Corp. v. Aspen Specialty Ins. Co.</u>, 661 Fed. Appx. 10, 13 (2d Cir. 2016); <u>New Sea Crest Health Care Ctr., LLC v. Lexington Ins. Co.</u>, No. 12-CV-6414(RJD)(RLM), 2014 WL 2879839 at *3 (E.D.N.Y. June 24, 2014). Inasmuch as the application of the Flood exclusion to storm surge damage is not in dispute, in the interest of brevity, Great Northern refers to its earlier brief on this issue. *See* ECF No. 22-3, Great Northern Memorandum of Law in Support of Summary Judgment ("GNIC MOL") at 11-19, PageID #: 491-99.

**B.      The Windstorm Deductible Endorsement is Not a Grant of Coverage.**

Madelaine contends that, even though the Flood exclusion precludes coverage for storm surge damage, the windstorm deductible language "gives back" flood coverage for wind-driven storm surge, rendering the Flood exclusion ambiguous. The windstorm deductible endorsement cannot, however, reasonably be interpreted as a grant of coverage.

The first page of the "Windstorm Or Hail Deductible Or Waiting Period Endorsement" [PageID #: 937-44] contains a schedule of premises that lists Madelaine's three buildings, and provides the new deductible amounts:

> Property Damage Dollar Deductible: $50,000
> Waiting Period: 72 HOURS

[PageID #: 937.] The endorsement then contains three sections titled Deductible, Waiting Period and Definitions. Madelaine previously has acknowledged that the first two sections of the

6

endorsement, *i.e.*, the sections titled Deductible and Waiting Period, do nothing more than change the deductible and waiting period applicable to a covered loss involving "windstorm". ECF No. 23-3, Madelaine MOL at 10-11, PageID #: 732-33. In particular, the windstorm deductible endorsement amended the windstorm deductible from the $25,000 general deductible to a $50,000 windstorm deductible.

The dispute between the parties -- and what the Second Circuit has asked this Court to focus on -- relates to the definition of the term "windstorm" contained in the windstorm deductible endorsement and, in particular, the ACC clause contained in that definition. The term "windstorm" is defined in the windstorm deductible endorsement as follows:

**Windstorm** means:

- wind;

- wind-driven rain;

- erosion of soil or other land caused by or resulting from wind or wind driven rain;

- hail; or

- collapse of a building or other structure caused by or resulting from wind, regardless of any other cause or event that directly or indirectly:

- contributes concurrently to; or

- contributes in any sequence to, the loss or damage, even if such other cause or event would otherwise be covered.

**Windstorm** does not mean:
- frost;

- cold weather;

- snow; or

- sleet or ice (other than hail), whether driven by wind or not.

All other terms and conditions remain unchanged.

[PageID #: 944.]

Under New York law, "[a]n insurance contract must be read as a whole to determine what the parties reasonably intended by its terms." IBM Poughkeepsie Employees Federal Credit Union v. Cumis Ins. Soc'y, Inc., 590 F. Supp. 769, 772 (S.D.N.Y. 1984) (citing Newmont Mines, Ltd. v. Hanover Ins. Co., 784 F.2d 127, 135 (2d Cir.1986)). This interpretation of the insurance contract as whole must give regard to all of the policy's provisions and "provisions should not be selected and interpreted in isolation, without regard to other provisions of the contract which bear upon them." Mercury Partners LLC v. Pacific Medical Buildings, L.P., No. 02-cv-6005, 2007 WL 2197830 (S.D.N.Y. Jul. 31, 2007); see also Shaw Group, Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 121 (2d Cir. 2003) (a contract "should be construed so as to give full meaning and effect to all of its provisions"). "Strained and unnatural readings of terms in an insurance policy are frowned upon and cannot be relied on to create ambiguities." 1070 Park Ave. Corp. v. Fireman's Fund Ins. Co., 313 F. Supp. 3d 528, 538 (S.D.N.Y. 2018).

Here, when looking at the Policy as a whole, it is clear that, although certain perils involved in a windstorm are covered under the Policy, wind-driven storm surge is excluded. Moreover, when looking at the Policy as a whole, it becomes abundantly clear that the windstorm deductible endorsement is not a separate coverage grant for windstorm. Rather, the endorsement simply applies a larger deductible and waiting period to covered loss or damage caused by or resulting from "windstorm", as defined in the endorsement, even if another covered cause or event directly or indirectly contributes concurrently or in any sequence to the loss or damage.

Several courts, particularly those in the Fifth Circuit following Hurricane Katrina, have examined windstorm deductible endorsements in the context of claims for storm surge damage.

8

In <u>Penthouse Owners Ass'n, Inc. v. Certain Underwriters at Lloyds, London</u>, 612 F.3d 383 (5th Cir. 2010) (applying Mississippi law), the insured plaintiff owned a condominium complex in Mississippi that was damaged by wind and storm surge from Hurricane Katrina.  The Policy excluded "flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not."  The flood exclusion also contained an ACC clause.  In addition, the policy included a "Windstorm or Hail Deductible" of 5% TIV (total insured value) that stated:

> The Windstorm or Hail Deductible . . . applies to loss or damage to Covered Property caused directly or indirectly by windstorm or hail, regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage.  If loss or damage from a covered weather condition other than windstorm or hail occurs, and that loss or damage would not have occurred but for the windstorm or hail, such loss or damage shall be considered to be caused by windstorm or hail and therefore part of the windstorm or hail occurrence. . . . The Windstorm or Hail Deductible applies whenever there is an occurrence of windstorm or hail.

The district court concluded that the Windstorm or Hail Deductible operated to provide coverage for hurricane damage regardless of whether the damage was caused by wind or flood. The district court noted that an ambiguity was created by the ACC clause in the deductible endorsement and in fact created a "reverse anti-concurrent cause clause."  In other words, the district court found -- similar to what Madelaine argues in this case -- that the deductible did not serve to limit coverage but rather expanded coverage to include any damage caused "concurrently or in any sequence to" windstorm damage, even if the damage otherwise would not have been covered under the flood exclusion.

On appeal, the Fifth Circuit rejected that argument, noting:

> We can acknowledge that some of the language of this Deductible -- "regardless of any other cause or event" -- may be misleading, **but only if read in virtual isolation.**  When the Deductible is read in its proper context of the policy as a whole, and with the common understanding of how deductibles operate in insurance policies, any ambiguity about the effect of this language on the scope of

coverage vanishes.  The purpose of a deductible is to shift some of the insurer's risk (that is, covered risk) to the insured, which is accomplished by setting a limit on the value of covered losses below which the insurer is not obligated to pay. . . . As a mechanism for shifting risk from the insurer to the insured, a deductible clause can only logically be applied after a covered loss has been established and it is unnatural to interpret a deductible clause as a mechanism that increases the risk of the insurer by expanding the scope of coverage. . . . Here the plain language of the Windstorm Deductible only describes when the deductible applies, and does not purport to describe, or even mention, the scope of the policy's coverage.  The purpose of the broad language, which the district court read as a "reverse anti-concurrent cause" clause, is actually to ensure that an insured cannot escape the applicability of the higher deductible for the windstorm and hail damage simply because other weather events (with lower deductibles) contributed to the loss.  That is the clause operates only when deciding whether to apply the deductible to a loss, *after* determining that coverage for the loss exists pursuant to the coverage defining portions of the policy.  The deductible endorsement does not create or extend coverage.

Id. at 387-88 (emphasis in bold added).  The Fifth Circuit concluded that the district court erred in holding that the windstorm deductible extended the policy's coverage to include water losses associated with windstorms.  Id. at 389.  See also In re Katrina Canal Breaches Litig., 495 F.3d 191, 220 (5th Cir. 2007) (where the insureds contended that the hurricane-deductible expanded coverage to all hurricane damage, the Fifth Circuit held that "[n]othing in the language of the [hurricane-deductible] endorsements purports to extend coverage for floods or to restrict flood exclusions. . . .")

While the Second Circuit's Summary Order in the Madelaine case distinguished the various Fifth Circuit hurricane cases on the basis that, in the Great Northern Policy issued to Madelaine, the ACC clause was contained in the definition of "windstorm" itself rather than in the paragraph describing the deductible, the distinction is without a difference.  In both instances, it is clear that a higher deductible applies to all covered loss involving "windstorm."  By defining the term "windstorm" in the endorsement, the Great Northern Policy makes it crystal clear what *covered* windstorm losses would be subject to a higher deductible, even if other *covered* weather events with lower deductibles contributed to the loss.  In the deductible endorsements of the

10

policies referred to in the Fifth Circuit cases, it is clear that "windstorm" losses are subject to a higher deductible but, without defining the term "windstorm," issues could arise as to what those insurers meant by the term "windstorm."

ACE American Ins. Co. v. Administrators of the Tulane Educational Fund, No. 07-cv-3749, 2008 WL 4091013 (E.D. La. Aug. 29, 2008), which involved the use of the term "windstorm" within a definition of "loss occurrence," rather than within a windstorm deductible endorsement is also instructive.  In Tulane, the flood exclusion, like the exclusion in the policy issued to Madelaine, contained ACC wording.  The policy contained a $100 million limit "per loss occurrence" and the policy defined "loss occurrence," in pertinent part, as follows:  "As regards windstorm, hail, tornado, hurricane, typhoon, cyclone including ensuing collapse and water damage, all individual losses sustained by the Insured occurring during any period of 72 consecutive hours arising out of and directly occasioned by the same event."  The insured, citing to the definition of "loss occurrence," took the position that all damages caused by a hurricane, including water damage, were covered.  ACE, by contrast, argued that the sole purpose of the "loss occurrence" endorsement was to better define what kind of losses constitute a single occurrence for the purpose of determining the number of limits of liability available to the insured in a particular instance but was not meant to address the actual scope of coverage afforded by the policy.

Finding the definition of "loss occurrence" did not impact the flood exclusion, the court agreed with ACE, stating:

> Analyzing the entire policy as a whole, the Court finds that the "loss occurrence" definition does not eviscerate the flood exclusion.  The term "loss occurrence" itself is used only once in the policy in the "Limits of Liability" section.  While the endorsement then explains what the term "loss occurrence" means in the context of a number of possible events, including a hurricane, given the placement of the actual term in the policy, the purpose of the definition is simply to delineate the

> number of times that Ace American may potentially be liable for the policy limits
> in a particular situation. . . . Thus, the definition of "loss occurrence" does not
> eviscerate the flood exclusion found in the Ace American policy.

Id. at *8.  The Tulane case also demonstrates that a policy needs to be read as a whole and a

definition or phrase used in a section of the policy that limits coverage cannot be interpreted to

void a clear flood exclusion.

Here, too, reading the Policy as a whole, it is clear that the windstorm deductible

endorsement and, in particular, the definition of "windstorm," cannot be construed as a grant of

coverage.  The entire purpose of including an ACC clause in a policy is to "avoid application of

the general rule that there is coverage so long as the efficient or dominant cause is covered."

Bozek v. Erie Ins. Group, 46 N.E.3d 362, 369 (Ill. App. 2015).See also In Re Katrina Canal

Breaches Litigation, 495 F.3d 222; Preferred Mut. Ins. Co. v. Meggison, 53 F. Supp. 2d 139, 142

(D. Mass. 1999).  Insurers started including ACC provisions in insurance policies around 1993 in

response to the concurrent causation doctrine, under which courts have found that insurers are

"obligated to pay for damages resulting from a combination of covered and excluded perils if the

efficient proximate cause is a covered peril."  Meggison, 53 F. Supp. 2d at 142 (citing Stephen P.

Pate, Recent Developments in Prop. Ins. Law, 33 Tort & Ins. L.J. 659 (Winter, 1993)).

The inclusion of the ACC clause in the windstorm deductible endorsement is consistent

with its industry usage. That is, it is  intended to *limit* coverage by ensuring that the higher

deductible for a covered "windstorm" loss applies even if there is another contributing covered

cause or event for which a lower deductible would apply.

Furthermore, the final phrase in the ACC clause of the windstorm definition -- stating that

damage with other concurrent cause(s) must be treated as windstorm damage "even if [the] other

cause or event would otherwise be *covered*," (emphasis added)  -- would make no sense if the

windstorm definition affirmatively conferred coverage. Under that reading, the ACC clause would

effectively state that the Policy covers damage caused by windstorm (as defined in the Policy), even if the damage also was caused by another *covered* peril.  Given that the perils listed in the windstorm definition are already covered  inasmuch as the Policy is an "all-risk" policy and the perils are not otherwise excluded, there would be no need to reference another already covered contributing peril. By contrast, if the endorsement merely is altering the deductible applicable to otherwise covered windstorm-related damage, the "even if" clause operates to ensure that the  other contributing covered peril does not result in a lower deductible.

Finally, if Madelaine intended to purchase flood coverage (which, as discussed below, it did not) and Great Northern had chosen to issue flood coverage, the Policy would have contained an endorsement quite similar to the "Additional Peril – Earthquake Limit/Deductible or Waiting Period Endorsement."   [PageID #: 929-36.]   Including the phrases "Additional Peril" and "Earthquake Limit" in that endorsement's title makes clear that the endorsement is providing coverage, subject to a sublimit of liability, for earthquake.  By contrast, the windstorm deductible endorsement makes no similar reference to coverage for any "additional peril." There simply is no language within the windstorm deductible endorsement that states that the Flood exclusion, or any other exclusion, is deleted or inoperative in the event of a windstorm event, as the earthquake endorsement does.  This conclusion clearly is reinforced by the final provision in the windstorm deductible endorsement:  "All other terms and conditions remain unchanged."  [Page ID #: 944.]

### C.     The Windstorm Deductible Endorsement Does Not Come Into Play Where, As Here, the Loss is Caused by an Excluded Peril.

As noted above, the insuring agreement of the Great Northern Policy states:  "We will pay for direct physical loss or damage to . . . **building** . . . or **personal property** . . . caused by or resulting from a peril not otherwise excluded. . . ."  [PageID #: 789.]  As both parties recognize, flood -- including storm surge -- is an excluded peril.  Accordingly, the coverage inquiry (at least

13

with respect to the damage caused by storm surge) should end there without any resort to the windstorm deductible language.  As the Fifth Circuit recognized in <u>Penthouse Owners</u>, "a deductible by definition only applies to covered perils, and can only sensibly be applied *once coverage is determined to exist*."  <u>Penthouse Owners</u>, 612 F.3d at 389 (emphasis added.)  Great Northern's witness, Steven Mortenson testified to this very point: ". . . I want to first start saying that the Windstorm Deductible Endorsement is not a grant of coverage. . . You don't even get to that particular endorsement unless . .  you have a covered cause of loss.  You don't even get there." (SSUF ¶ 18.)

At least one court has concluded that, where the policy excludes flood with an ACC clause, coverage is not available for wind-driven storm surge even where the policy specifically covers "direct and/or indirect action of wind . . . and all loss or damage resulting therefrom caused by wind . . . ."  <u>Arctic Slope Regional Corp. v. Affiliated FM Ins. Co.</u>, 564 F.3d 707, 710-11 (5th Cir. 2009) (applying Louisiana law).  In <u>Arctic Slope</u>, the insured sustained storm surge damage from Hurricane Rita.  The policy contained a flood exclusion with an ACC clause for flood in low-lying areas, but covered wind and/or hail, subject to a special sub-limit and deductible.  The definition of "wind and/or hail" was, according to the Court, "rather broad":

> **Wind and/or hail** means direct and/or indirect action of wind and/or hail and all loss or damage resulting therefrom whether caused by wind, by hail or by any other peril other than fire or explosion including but not limited to, loss or damage caused when water . . . is carried, blown, driven, or otherwise transported by wind onto or into said location.[9]

The insured argued that the damage fell squarely within the plain language of the wind/hail provision because storm surge consisted of water driven by wind onto its property.  Based on this

---

[9] While the definition of "windstorm/hail" in the Arctic Slope case did not contain a verbatim ACC clause, the court itself noted that the definition was "rather broad" and included, among other things, indirect action of windstorm/hail and, in particular, a situation where water is driven onto property by wind.

premise, the insured contended that the policy was ambiguous because it excluded coverage for storm surge damage within the flood exclusion while granting coverage for the same damage in the wind/hail provision.  Id. at 711.  The Fifth Circuit noted that, even if a hurricane storm surge fell within the definition of both an excluded peril (flood) and a covered peril (wind), the policy is not ambiguous because the policy explicitly stated that it covered all risks of direct physical loss or damage "except as excluded under the policy."  Id.  The court went on to conclude:  "There is no ambiguity when the policy is read as a whole.  The exclusion of storm surge as a flood event cannot be reversed by its possible inclusion as a wind event."

Where, as here, the Policy specifically excludes wind-driven flood, storm surge damage is not covered and there is no need to even look to any deductible provision with respect to that storm surge damage.  Madelaine's insurance broker, Steven Mossner, recognized as much when he testified at his deposition:  "you only have deductibles in a policy where there is a grant of coverage against which the deductible can be applied."  (SSUF ¶ 14, bullet point 4.)

## II.   APPLYING THE DEFINITION OF "WINDSTORM" IN THE ENDORSEMENT TO THE ENTIRE POLICY DOES NOT ALTER THE CONCLUSION THAT THE FLOOD EXCLUSION UNAMBIGUOUSLY PRECLUDES COVERAGE FOR STORM SURGE DAMAGE.

The Second Circuit noted in its October 23, 2018 Summary Order that the cases in this Circuit categorizing storm surges as "floods" are inapposite "because the insurance policies analyzed therein did not involve endorsements that explicitly added . . . an ACC clause to the definition of a covered peril for the entire Policy."  Madelaine Chocolate, 752 Fed. Appx. at 50.  The Second Circuit opinion went on to state:  "The District Court erred by analogizing the Windstorm Endorsement to the hurricane deductible endorsements in the Katrina Cases without further analyzing the function of an ACC clause when added to the definition of a covered peril for the entire Policy."  Id.  It appears that the Second Circuit's concern with the application of, and

15

potential conflict between, the ACC clause in both the flood exclusion and the definition of windstorm in the windstorm deductible endorsement rested on the Court's misplaced assumption that the insuring agreement of the Policy referred specifically to the term "windstorm."

Page 3 of the BPP coverage form states:  "Words and phrases that appear in **bold** print have special meanings and are defined in the Property/Business Income Conditions And Definitions form included in this policy." [PageID #:789.]  Notably, apart from the windstorm deductible endorsement, the term "windstorm" does *not* appear in bold print anywhere in the Policy. Therefore, the definition of "windstorm" in the windstorm deductible endorsement applies only within the endorsement itself, not to the entire policy.

In any event, even if, for argument's sake, the definition of "windstorm" found in the windstorm deductible endorsement did apply to all un-bolded references to "windstorm" in the BPP policy form, that definition would not impact the Policy's insuring agreement or render the Policy ambiguous.  In this regard, aside from the windstorm deductible endorsement, the unbolded word "windstorm" is used in only the following Policy provisions:

- the definition of "**Occurrence**" in the Definitions form [PageID #: 894];

- the Loss Payment Limitations section of the BPP form, the Business Income form, the Extra Expense form, and the Accounts Receivable form applicable to "Loss or Damage to Electronic Data" [PageID #: 813, 827-28, 852-53, and 865-66];

- the definition of "**technology peril**" in the Definitions form [PageID #: 906]; and

- the definition of "**specified peril**" also in the Definitions form. [PageID #: 905.]

16

These four provisions have no impact on the scope of coverage afforded under the Policy.

Inasmuch as the Policy is an "all risk" policy, the insuring agreement does not refer to specific covered perils but rather, covers "direct physical loss or damage . . . caused by or resulting from a peril not otherwise excluded. . . ." [PageID #789.]  This is not a situation where the Policy's insuring agreement states that the insurer will pay for "windstorm loss," in which case the definition of "windstorm" would come into play in connection with determining if a loss were covered in the first instance.  Thus, applying the definition of "windstorm" throughout the policy has no impact on the scope of coverage afforded under the Policy because defining the term "windstorm" does not in any way amend the Policy's coverage grants nor its exclusions. Here, as previously discussed, the storm surge damage to Madelaine's premises is, indeed, an excluded peril, *i.e.*, "flood."  There is no conflict between the ACC clause in the Flood exclusion and the ACC clause in the definition of "windstorm" because the two provisions would not be read together in the context of a storm surge loss.

Accordingly, applying the definition of "windstorm" to all references to "windstorm" throughout the Policy does not alter the conclusion that Madelaine's storm surge loss is excluded under the flood exclusion.  The insuring agreement of the Policy does not contain the word "windstorm," and the definition of "windstorm" in the windstorm deductible endorsement applies -- if at all -- only where the term "windstorm" actually is referenced.

## III.   EXTRINSIC EVIDENCE DEMONSTRATES THAT MADELAINE HAD NO REASONABLE EXPECTATION OF RECEIVING FLOOD COVERAGE.

The Second Circuit, in its October 23, 2018 decision, stated that the "District Court may consider permitting discovery into interpretive materials relating to the Windstorm Endorsement and its relationship to the Policy's coverage provisions."  Madelaine,  752 Fed. Appx. at 50.  To

the extent that this Court concludes that the Policy language is ambiguous,[10] the Court must examine ambiguous terms "from the vantage point of the 'reasonable expectations and purposes of the ordinary [person] . . . and should consider extrinsic evidence of the parties' intentions.'" Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691, 695 (2d Cir. 2013).   The additional discovery, including party depositions, reveals that neither party intended the windstorm deductible endorsement to provide flood coverage for Madelaine's storm surge losses.

### A.     Madelaine Declined to Purchase Flood Coverage.

Madelaine, at the time it entered into the 2011–2012 Great Northern Policy, could not have had any reasonable expectation that it was entitled to coverage for storm surge flooding under the windstorm deductible endorsement.  An objective look at the history of Madelaine's commercial insurance program going back to 1996, the admitted failure of its officers to ever read any Great Northern policy before Storm Sandy,[11] and Madelaine's purchase of separate NFIP flood insurance, demonstrates that Madelaine had no reasonable expectation of coverage for damage resulting from storm surge flooding under the Policy as a whole, or under the windstorm deductible endorsement.

Madelaine's business is located on a narrow peninsula; it sits just three blocks from the Atlantic Ocean and one block from Jamaica Bay.  (SSUF ¶ 30.) As a practical matter, the risk of substantial flooding to which Madelaine was exposed was the risk of coastal flooding. Madelaine is run by sophisticated individuals. For years it has had its own in-house counsel (Scott Wright) and a CPA (Norman Gold) managing its insurance program. (SSUF ¶¶ 22-24.)  Madelaine had

---

[10]An insurance contract is ambiguous only if its terms are susceptible to more than one *reasonable* interpretation. Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992) (emphasis added); Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997).  As discussed in Points I and II above, the Policy is unambiguous with respect to the application of the Flood exclusion.

[11] *See* SSUF ¶ 29.

assistance in the procurement of necessary and appropriate insurance products from I. Dachs & Sons, Inc. ("I. Dachs"), a licensed broker with whom Madelaine had a relationship for more than 50 years. (SSUF ¶¶ 3-6.) Madelaine understood for years that it faced the potential risk of coastal flooding due to its location and procured limited NFIP flood insurance ($1 million per building) continuously since at least 1996 as a hedge against a flood event. (SSUF ¶¶ 35-36.)

From November 12, 1996 to November 12, 2001, in addition to the NFIP flood insurance, Madelaine also purchased up to $2.5 million of excess flood insurance coverage from Great Northern. (SSUF ¶ 37.) This excess flood insurance coverage was added to Madelaine's policy pursuant to an endorsement captioned "Additional Peril – Flood Limit/Deductible Or Waiting Period" form. (SSUF ¶ 37 and Ex. 19 thereto at Bates MC/GNIC Pol – 00971-974 and Ex. 21 thereto at Bates pages MC/GNIC Pol-00753-756.) That flood endorsement expressly set forth a limit of liability for flood, and also contained a provision expressly deleting the flood exclusion contained in the policy's BPP form and Business Income form. (SSUF ¶ 37 and Ex. 19 thereto at Bates MC/GNIC Pol – 00971 and Ex. 21 thereto at Bates pages MC/GNIC Pol-00753.)

Madelaine and its insurance broker knew how to obtain excess flood insurance coverage, including coverage for storm surge flooding, when they wanted it. Madelaine had purchased such coverage for five policy years (1996-1997 through 2000-2001). (SSUF ¶ 37.) It deliberately dropped that coverage starting on November 12, 2001 in a calculated gamble to save money. Notably, both Norman Gold, Madelaine's vice president, and Harvey Dachs, Madelaine's insurance broker, testified that, back in 2001, the premium for $500,000 in excess flood coverage through Great Northern would be $26,000 and that a $2.5 million flood limit would be $74,000. (SSUF ¶ 38.) As Norman Gold testified: "It was too expensive to carry that additional [excess] flood policy. . . . [W]e knew that flood was not a risk that we could afford to pay extra for,"

particularly where Madelaine had not had a flood loss since opening its facilities in the current

location in 1967.  (SSUF ¶ 44.)  When asked how the cost of excess flood coverage affected

Madelaine's decision to decline such coverage during the 2001 renewal, Gold testified:  "We were

running a business.  We are making candy.  We wanted to have a profitable business, and we

wanted to cut our costs wherever we could."  (SSUF ¶ 44.)

This testimony underscores the fact that Madelaine understood the importance of flood

coverage, but made a calculated decision not to purchase flood coverage from Great Northern after

2001.  Madelaine's intent is clear:  it elected to forgo the purchase of flood coverage because of

the premium cost for that coverage.  It defies logic for Madelaine to now argue that it is entitled to

over $50 million in flood coverage when it specifically declined to purchase such coverage for

many years before the Sandy loss.

Norman Gold, who managed Madelaine's insurance program at all times from 1996

through Storm Sandy, testified that he never studied the policies, never read the policies, and never

asked anyone at I. Dachs (insurance broker) to explain the policies and what they covered and did

not cover.  (SSUF ¶ 26.)  To the extent, therefore, that Madelaine takes the position that it did not

need to purchase flood coverage from Great Northern because it understood and expected that

storm surge coverage was provided under the windstorm deductible endorsement, such argument

should be rejected summarily.[12]

Indeed, if Madelaine truly believed that the windstorm deductible endorsement provided

coverage for storm surge damage, Madelaine would have canceled the three NFIP flood policies

it maintained as a further cost-saving measure.  When asked whether Madelaine simply could have

---

[12] Madelaine has not produced any evidence showing that it interpreted the windstorm deductible endorsement as a
coverage grant at any time before or at the time of the Sandy loss.  Under New York law, an interpretation of policy
terms is unreasonable where it is created once coverage is denied and the interpretation is "dreamed up by attorneys."
1070 Park Ave. Corp., 313 F. Supp. 3d at 539.

canceled those three NFIP policies to save $8,000 in insurance premiums, Mossner testified that he would not have made such a recommendation because he wanted Madelaine "to be protected . . . [a]gainst the coverage under the policy, flood coverage." (SSUF ¶ 11.)  Similarly, Harvey Dachs of I. Dachs testified that he also would not have recommended canceling primary flood coverage because Madelaine only had that primary flood coverage and "they needed some flood coverage. . . [b]ecause they're in a flood zone." (SSUF ¶ 11.)

      **B.**      **Great Northern Did Not Intend to Eviscerate the Flood Exclusion in its Policy by Including the Windstorm Deductible Endorsement.**

Michael Bruno, a Senior Home Office Property Underwriter at Chubb/Great Northern and one of Great Northern's corporate representatives in this litigation, testified at his deposition that the windstorm deductible endorsement is not appended to every policy that Great Northern issues. (SSUF ¶ 16.)  Rather, the endorsement is attached to policies "where an underwriter wants to apply a separate deductible for the peril of windstorm, typically, because guidelines have stated this insured . . . is in a windstorm control zone area and in order to meet our underwriting guidelines, we need to apply a higher deductible for the peril of windstorm."  (SSUF ¶ 16.)  Had Great Northern not included the windstorm deductible endorsement on the Policy issued to Madelaine, there would be no definition of "windstorm" in the Policy and, thus, no argument by Madelaine that its storm surge loss could be covered as it would clearly be excluded under the Flood exclusion.  By adding the windstorm deductible -- so as to reduce the risk of loss to Great Northern -- Madelaine now argues that the deductible endorsement *expands* coverage to include wind-driven flood without any attendant premium increase.  This reading of the Policy makes no sense and was clearly never intended by Great Northern or contemplated by Madelaine or its broker.

## **CONCLUSION**

For the reasons discussed above and in Great Northern's prior briefing in this Court, the ACC clause in the definition of "windstorm" does not conflict with or eviscerate the clear and unambiguous Flood exclusion in the Great Northern Policy. Indeed, applying the definition of "windstorm" throughout the Policy where that term is used does not alter the conclusion that storm surge damage is excluded under the Flood exclusion. To the extent this Court is inclined to consider extrinsic evidence of the parties' intent, it is abundantly clear that Madelaine opted not to purchase costly flood coverage from Great Northern and that Great Northern did not intend to provide flood coverage by including the windstorm deductible endorsement. There is no evidence that Great Northern intended to create storm surge coverage by including the windstorm deductible endorsement. The plain wording of the windstorm deductible endorsement, and a reading of the Policy as a whole, makes it clear that the purpose of the windstorm deductible endorsement was to ensure that the higher windstorm deductible applied to any covered losses that occurred during a windstorm even in the event there was more than one covered cause of loss involved in a particular claim.

Accordingly, Great Northern respectfully requests that this Court grant Great Northern's renewed motion for summary judgment and dismiss this action.

Respectfully submitted,

MOUND COTTON WOLLAN
& GREENGRASS LLP

By:    /s/ Philip C. Silverberg
       Philip C. Silverberg (PS 8110)
       Hilary M. Henkind (HH 5801)

-and-

COZEN O'CONNOR
A Pennsylvania Professional Corporation

       Thomas McKay, III (TM 9676)
       Richard M. Mackowsky (RM 6426)
         (admitted pro hac vice)
       Charles J. Jesuit, Jr. (CJ 9977)
         (admitted pro hac vice)
       Melissa Brill (MB 4374)

*Attorneys for Defendant*
*Great Northern Insurance Company*

Dated:  April 19, 2019

23