FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 19 2019 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
MADELAINE CHOCOLATE
NOVELTIES,
                      Plaintiff,

      - against -

GREAT NORTHERN INSURANCE CO.,

                     Defendant.
------------------------------------------------------------ x

**MEMORANDUM & ORDER**

15 CV 5830 (RJD)(SMG)

DEARIE, District Judge:

      Plaintiff Madelaine Chocolate Novelties ("Plaintiff" or "Madelaine") brings a breach of contract claim against Great Northern Insurance Co. ("Defendant" or "Great Northern"), relating to insurance coverage for building damage and business losses following Superstorm Sandy ("Sandy"). Madelaine claims that loss and damage sustained as a result of Sandy must be covered under its all-risks insurance policy ("Policy") with Great Northern because it was caused by a windstorm—a "peril" covered by the Policy, regardless of any other concurrent or contributing cause. Great Northern, on the other hand, argues that the Policy's "Flood Exclusion" unambiguously precludes coverage. In sum and substance, the question confronting the Court on summary judgment is the Policy's scope of coverage: does the Policy cover loss and damage caused by a windstorm regardless of any other concurrent or contributing cause, or does the Flood Exclusion preclude coverage entirely? The parties filed cross-motions for summary judgment, and for the reasons that follow, the Court the finds that (i) the Policy's coverage grant is ambiguous, and (ii) the extrinsic evidence proffered reveals a triable issue of fact, inappropriate for summary judgment. Accordingly, the parties' motions for summary judgment are denied.

## FACTUAL AND PROCEDURAL BACKGROUND

I. Policy Coverage for Loss or Damage Caused by or Resulting from Superstorm Sandy

On October 29, 2012, as Sandy made landfall in New York, Madelaine's manufacturing facility, located one block from Jamaica Bay, sustained significant damage resulting in substantial inventory and business income losses. Madelaine submitted an itemized proof of loss to Great Northern for over $53 million. Great Northern paid just under $4 million and claimed that the remaining losses were not covered as a result of the Policy's Flood Exclusion. At the time, Madelaine was insured by Great Northern's Customarq Classic Insurance Program, which included coverage for "Building and Personal Property" damage as well as "Business Income with Extra Expense" losses. The Policy obligated Great Northern to pay for (i) "direct physical loss or damage to: building, or personal property, caused by or resulting from a peril not otherwise excluded" and (ii) "actual business income loss…and extra expense…incur[red] due to the actual or potential impairment of…operations…caused by or resulting from direct physical loss or damage by a covered peril to property, unless otherwise stated." ECF No. 56-5, at M_00003958, M_00003987.[1]

The Policy also contains a series of coverage exclusions, including a "Flood Exclusion" which eliminates coverage for "loss or damage caused by or resulting from: waves, tidal water or tidal waves; or rising, overflowing or breaking of any boundary, of any…oceans or any other body of water or watercourse, whether driven by wind or not, *regardless of any other cause or event that directly or indirectly: contributes concurrently to; or contributes in any sequence to, the loss or damage, even if such other cause or event would otherwise be covered.*" Id., at M_00003974 (emphasis added). The latter half of the Flood Exclusion constitutes what is

---

[1] A "covered peril" is "a peril covered by the Form(s) shown in the Property Insurance Schedule of Forms," but the Policy does not include a separate definition for the term "peril." ECF No. 56-5, at M_00004056.

2

known in the insurance industry as an anti-concurrent causation ("ACC") clause. In the context of the Flood Exclusion, the ACC clause means that where loss or damage results from or is caused by some combination of covered *and* excluded causes, such as a flood, the resulting loss or damage will not be covered and the exclusion will govern.

Finally, the Policy includes a series of appended, but simultaneously executed, endorsements, including a "Windstorm Endorsement." The Windstorm Endorsement is comprised of three provisions: (i) a provision that increases the deductible for damage caused by a "windstorm" from $25,000 to $50,000 ("Windstorm Deductible"), (ii) a provision that extends the waiting period for business income losses caused by a windstorm from 24 hours to 72 hours ("Windstorm Waiting Period"), and (iii) a provision that defines a "windstorm" as "wind, wind-driven rain…*regardless of any other cause or event that directly or indirectly: contributes concurrently to; or contributes in any sequence to, the loss or damage, even if such other cause or event would otherwise be covered*" ("Windstorm Definition"). Id., at M_00004113 (emphasis added). Like the Flood Exclusion, the Windstorm Definition within the Windstorm Endorsement also contains an ACC clause.

II.     "Madelaine I" and Second Circuit Appeal

The Court granted summary judgment in favor of Great Northern on September 26, 2017. Madelaine Chocolate Novelties v. Great Northern Insurance Co., 2017 WL 4280550 (E.D.N.Y. Sept. 26, 2017). On appeal, the Second Circuit concluded that the "the Windstorm Endorsement adds an ACC clause to the definition of a covered peril for the entire Policy," noting "it is undisputed that, for purposes of the Policy, a 'windstorm' is a covered peril." Madelaine Chocolate Novelties, Inc. v. Great Northern Insurance Co., 752 F. App'x 47, 48, 50 (2d Cir. 2018). The Second Circuit directed this Court on remand (i) to "assess whether the Windstorm

3

Endorsement's ACC clause conflicts with or otherwise creates an ambiguity vis-à-vis the Policy's Flood Exclusion," and (ii) to the extent this Court concludes an ambiguity exists, to consider "interpretive materials relating to the Windstorm Endorsement and its relationship with the Policy's coverage provisions." Id. at 50.

III.  "Madelaine II"

In its renewed motion for summary judgment Madelaine argues that applying the Windstorm Definition's ACC clause to the entire Policy creates an ambiguity that cannot be resolved in Great Northern's favor because (i) the Windstorm Definition's ACC clause supersedes the Flood Exclusion's ACC clause as an "added or attached" change to the "basic insurance contract" and (ii) the record is otherwise devoid of any relevant extrinsic evidence supporting an interpretation that would foreclose coverage. As a result, Madelaine argues, the last-resort doctrine of *contra proferentem* compels the Court to resolve the Policy's ambiguity in favor of the insured. On the other hand, Great Northern argues that (i) the Flood Exclusion unambiguously precludes coverage because "applying the definition of 'windstorm' throughout the policy has no impact on the scope of coverage afforded under the Policy," and (ii) even if the Windstorm Definition creates an ambiguity vis-a-vis the Flood Exclusion, extrinsic evidence favors Great Northern because it reveals that Madelaine had no reasonable expectation of receiving flood coverage, under any circumstances, when it purchased its Great Northern insurance policy.

**LEGAL STANDARD**

To prevail on a motion for summary judgment, the moving party must "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a

4

question of material fact and the Court must view all facts "in the light most favorable" to the non-moving party and resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. Tolan v. Cotton, 572 U.S. 650, 660-61 (2014). On the other hand, to survive a motion for summary judgment, the non-moving party must establish a genuine issue of fact "by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). "Where parties make cross motions for summary judgment, the standard is the same as that for individual motions. The district court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Marotta v. Road Carrier Local 707 Welfare Fund, 100 F. Supp. 2d 149, 155 (E.D.N.Y. 2000) (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993)).

In considering cross-motions for summary judgment bearing on the interpretation of a contract, summary judgment is appropriate where (i) the contractual language is "unambiguous and conveys a definite meaning," Sayers v. Rochester Tel. Corp. Supplemental Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993), (ii) the contract is ambiguous, but there is no relevant extrinsic evidence to resolve the ambiguity, Andy Warhol Foundation for Visual Arts, Inc. v. Federal Ins. Co., 189 F.3d 208, 215 (2d Cir. 1999) ("[e]ven though a contract may be ambiguous, summary judgment may nonetheless be appropriate where a court is in position to resolve the ambiguities through a legal rather than factual, construction of its terms"), or (iii) "the rare event . . . where the extrinsic evidence of the parties' intent is so one-sided in one party's favor that no reasonable person could reach the contrary conclusion," Ross Univ. Sch. of Medicine, Ltd. v. Brooklyn-Queens Health Care, Inc., 2013 WL 1334271, at *8 (E.D.N.Y. Mar. 28, 2013) (citing Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232

F.3d 153, 158 (2d Cir. 2000)). The Court cannot consider extrinsic evidence unless it determines the relevant contractual provision is sufficiently ambiguous as to be "susceptible of at least two fairly reasonable meanings." Wards Co., Inc. v. Stamford Ridgeway Assoc's, 761 F.2d 117, 120 (2d Cir. 1985).

## DISCUSSION

I. The Windstorm Definition's ACC Clause Creates an Ambiguity Vis-à-vis the Flood Exclusion.

*a. Legal Standard.*

As a general matter, an insurance policy "must be construed to effectuate the intent of the parties as derived from the plain meaning of the policy's terms," unless the policy's terms are ambiguous. Andy Warhol, 189 F.3d at 215. In that case, the Court must look outside the four corners of the policy to "ascertain the intent of the parties." Id. An ambiguity arises where the policy's terms "are reasonably susceptible to more than one interpretation," id., "when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business," Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002). In determining whether a policy is ambiguous, an interpretation that "ha[s] the effect of rendering at least one clause superfluous or meaningless…is not preferred," Garza v. Marine Transport Lines, Inc., 861 F.2d 23, 27 (2d Cir. 1988).

If a possible ambiguity turns on the interpretation of a policy coverage exclusion, the exclusion must be "stated in clear and unmistakable language" and the insurer bears the "heavy" burden of proving the exclusion "is subject to no other reasonable interpretations, and applies in

6

the particular case." Lantheus Medical Imaging, Inc. v. Zurich Am. Insur. Co., 650 F. App'x 70, 71-72 (2d Cir. 2016); Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 42 (2d Cir. 2006); see also Beazley Insur. Co., Inc., v. ACE American Insur. Co., 880 F.3d 64, 68-69 (2d Cir. 2018) (enforceable exclusions must have "a definite and precise meaning, unattended by danger of misconception"). Ultimately, the Court must bear in mind that when assessing whether a policy is ambiguous on a motion for summary judgment, "the key is issue-finding, not issue-resolution" and unless the Court finds the policy is not "susceptible of at least two fairly reasonable meanings, a material issue exists concerning the parties' intent, and the non-moving party has a right to present extrinsic evidence regarding the meaning of the contested term." Wards Co., Inc., 761 F.2d at 120 (internal citations omitted).

   b. *The Windstorm Definition Applies to the Policy's Coverage-Granting Clauses.*

The parties disagree on the extent to which the Windstorm Definition, including the ACC clause, applies throughout the Policy, and specifically whether it applies only where the term "windstorm" is used or where the terms "peril" or "covered peril" are referenced more generally. Great Northern argues that because the Windstorm Definition only applies "to the places in the Policy where the term windstorm is used" and "windstorm is not used in any insuring agreement in the Policy" the Windstorm Definition does not apply to any of the Policy's coverage-granting clauses. Def. Opp. Br., ECF No. 56-30, at 9. Madelaine contends that because a "windstorm" is a "covered peril," the Windstorm Definition is incorporated by reference in the Policy's coverage-granting clauses. Pl. Br., ECF No. 56-3, at 13.

The Windstorm Definition applies to the entire Policy, including to the definition of a "covered peril" and to the stand-alone term "peril." The Second Circuit observed (i) "[i]t is undisputed that, for purposes of the Policy, a 'windstorm' is a covered peril," (ii) the Windstorm

7

Definition "explicitly adds an ACC clause to the definition of 'windstorm' for the entire Policy and (iii) the District Court should have "further analyz[ed] the function of an ACC clause when added to the definition of a covered peril for the entire Policy." Madelaine Chocolate Novelties, 752 F. App'x at 48, 50. Taken together, these directives result in the unmistakable conclusion that the Windstorm Definition, including its ACC clause, should apply any time the term "covered peril" is used throughout the Policy. And, because it is undisputed that (i) the Policy's coverage for building or personal property damage is "all risks"—meaning all losses caused by or resulting from "a peril not otherwise excluded" are covered—and (ii) there is no specific exclusion for damage caused by a windstorm, a "windstorm" is therefore also a "peril," even when that term is not preceded by the word "covered." Def. 56.1 Response, ECF No. 56-29, at ¶7. The more limited application of the Windstorm Definition advanced by Great Northern ignores the "all-risks" nature of the Policy and contradicts the Second Circuit's express instructions.

Accordingly, the Windstorm Definition applies (i) where the term "windstorm" appears throughout the Policy in bold, (ii) to the definition of "covered peril," and (iii) to the stand-alone term "peril." Applying the Windstorm Definition to the Policy's coverage-granting clauses, which encompass damage caused by "covered perils" and "perils," the Policy covers (i) "direct physical loss or damage to: building; or personal property, caused by or resulting from a **windstorm...regardless of any other cause or event that directly or indirectly: contributes concurrently to; or contributes in any sequence to, the loss or damage, even if such other cause or event would otherwise be covered** not otherwise excluded" *and* (ii) "actual or potential impairment of operations...caused by or resulting from direct physical loss or damage by a **windstorm...regardless of any other cause or event that directly or indirectly:**

8

**contributes concurrently to; or contributes in any sequence to, the loss or damage, even if such other cause or event would otherwise be covered** to property, unless otherwise stated."

  *c. The Windstorm Definition Applied to the Policy's Coverage-Granting Clauses Creates an Ambiguity Vis-à-Vis the Flood Exclusion.*

Though Madelaine agrees that the Windstorm Definition should apply to the entire Policy, including the Policy's coverage-granting clauses, Madelaine's analysis improperly isolates the Windstorm Definition from the Policy's coverage-granting clauses to orchestrate a conflict between the Windstorm Definition's ACC clause and the Flood Exclusion's ACC clause. Great Northern, who does not even entertain the possibility that the Windstorm Definition applies to the Policy's coverage-granting clauses, nevertheless notes that "Madelaine uses a side-by-side comparison chart of the ACC clauses…to incorrectly suggest that the similar ACC wording…simultaneously grants coverage for damage caused by wind, regardless of any other contributing cause (such as water), and excludes coverage for damage caused by water, regardless of any other contributing cause (such as wind)." Def. Opp. Br., ECF No. 56-30, at 2. Indeed, if, as Madelaine argues, the Windstorm Definition applies to the definition of a "covered peril" or to the term "peril" in the Policy's coverage-granting clauses, then the Court must assess whether there is an ambiguity when viewing the coverage-granting clauses in their entirety, *including the Windstorm Definition*, and the Flood Exclusion side-by-side.

When the Court applies the Windstorm Definition to the Policy's coverage grants for damage caused by a "peril not otherwise excluded" or losses attributable to a "covered peril…unless otherwise stated," it cannot ignore the exclusionary clauses—"not otherwise excluded" and "unless otherwise stated." Giving effect to those exclusionary clauses, as well as the language in the Windstorm Definition, results in an interpretation of the Policy that

9

(i) generally covers loss or damage caused by a windstorm *and* (ii) requires a windstorm be the operative cause where there is more than one *covered* cause for purposes of calculating a deductible or waiting period *but* (iii) nevertheless excludes coverage where loss or damage is caused by a flood, even when a windstorm is a concurrent or contributing cause. Under this approach, the exclusionary clauses, "not otherwise excluded" and "unless otherwise stated," neutralize the Windstorm Definition's ACC clause and trigger the Policy's exclusions where loss or damage is caused by or results from covered *and* excluded causes. In other words, loss or damage caused by or resulting from a windstorm and another concurrent or contributing *covered* cause is covered as loss or damage *from a windstorm*, but where loss or damage is caused by or results from a windstorm and a concurrent or contributing *excluded* cause, the Windstorm Definition's ACC clause is inapplicable, and the "not otherwise excluded" and "unless otherwise stated" phrases require consultation with the Policy's relevant exclusions.

If the Court limits its analysis to a side-by-side comparison of the Windstorm Definition and the Flood Exclusion, without the rest of the coverage-granting language, it would ignore the exclusionary phrases in the Policy's coverage grants, leaving them without force and effect. U.S. Fidelity and Guar. Co. v. Fendi Adele S.R.L., 823 F.3d 146, 150 (2d Cir. 2016) ("A reviewing court must decide whether, affording a fair meaning to *all of the language*...and leaving no provision without force and effect, there is a reasonable basis for a difference of opinion as to the meaning of the policy"(emphasis added)); Garza, 861 F.2d at 27 (an interpretation which "would have the effect of rendering at least one clause superfluous or meaningless...is not preferred and will be avoided if possible"). But, if the Court "afford[s] a fair meaning to *all* of the language" in the coverage-granting clauses, and compares that language side-by-side with the Flood Exclusion, the Windstorm Definition's ACC clause cannot apply to loss or damage from covered

*and* excluded causes without rendering the "not otherwise excluded" and "unless otherwise stated" phrases meaningless. U.S. Fidelity and Guar. Co., 823 F.3d at 150. Similarly, the phrase "even if there is another concurrent or contributing *covered* cause" would be meaningless if the Windstorm Definition's ACC clause applied to loss or damage from covered *and* excluded causes. If the Windstorm Definition's ACC clause applied to loss or damage from a windstorm *and* a flood, it could have simply stated "even if there is another concurrent or contributing cause." Giving all of the relevant language in the Policy's coverage-granting clauses force and effect, the Windstorm Definition's ACC clause would operate where there is more than one *covered* cause for purposes of calculating a deductible or waiting period, *but* where there is a windstorm and an *excluded* cause, the Windstorm Definition's ACC clause would be inapplicable and the exclusionary phrases direct the reader to the Policy's relevant exclusions.

Though this approach makes a "reasonable effort" "to harmonize and give effect to *all parts* of the contract," GEICO Marine Insurance Co. v. Great Northern Insurance Co., 2017 WL 4286394, at *5 (S.D.N.Y. Sept. 11, 2017), it is nevertheless undercut by the fact that it would require the Court to add language to the Policy reflective of the parties' intent. Courts may only supply "a missing term in a contract" "[i]n limited circumstances," where "the term may be fairly and reasonably fixed by the surrounding circumstances and the parties' intent," In re World Trade Center Disaster Site Litig., 754 F.3d 114, 122-23 (2d Cir. 2014), and "should be extremely reluctant . . . to imply a term that the parties have neglected to specifically include," id.; Spanski Enterprises, Inc. v. Telewizja Polska, S.A., 581 F. App'x 72, 73 (2d Cir. 2014) ("courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing").

11

To reconcile the coverage-granting clauses with the Windstorm Definition, the Court would need to add language: "windstorm loss or damage is covered regardless of any other concurrent or contributing cause, even if that cause is covered" **and** "not otherwise excluded." Inserting the word "and" would unambiguously preclude coverage where there are both covered *and* "otherwise excluded" causes. However, this addition assumes too much about the parties' intent, particularly in light of the overarching principle that potential ambiguities in insurance policies should generally be resolved in favor of the insured. Dalton v. Harleysville Worcester Mut. Ins. Co., 557 F.3d 88, 93 (2d Cir. 2009). With that overlay in mind, the Court must look to extrinsic evidence of the parties' intent—which it cannot do in making the threshold determination of whether the Policy is, as a matter of law, ambiguous. Morgan Stanley Grp. Inc. v. New England Ins. Co., 225 F.3d 270, 275-76 (2d Cir. 2000). Notwithstanding the existence of *a* reasonable interpretation of the Policy that applies the Windstorm Definition to the Policy's coverage-granting clauses and gives effect to all of the language, the need to "supply a missing term" and in so doing surmise the parties' intent, persuades the Court that applying the Windstorm Definition to the Policy as a whole, creates an ambiguity vis-à-vis the Flood Exclusion.

> d. *The Ambiguity is Bolstered by the Need to Accord Policy Exclusions a Strict and Narrow Construction.*

The Court is even more convinced there is an ambiguity in light of the well-settled principle that insurance policy exclusions must be "clear and unmistakable." Insurance policy exclusions cannot be "extended by interpretation or implication" but must instead be "accorded a strict and narrow construction," Seaboard Sur Co. v. Gillette Co., 64 N.Y.2d 304, 311 (1984), and where enforcement of a policy exclusion would carry with it "danger of misconception" or a

"reasonable basis for a difference of opinion" it should not be enforced. Beazley Insur. Co., Inc., 880 F.3d at 68-69.

Applying the Flood Exclusion, notwithstanding the Windstorm Definition's ACC clause, to deny Madelaine coverage would require the Court to take too many inferential steps—bordering on guesswork of the parties' intent without first consulting extrinsic evidence. Even when the Court views the coverage-granting clauses, including the *entire* Windstorm Definition, side-by-side with the Flood Exclusion, the presence of "dueling" ACC provisions, and the need to construe policy exclusions strictly and narrowly, provides a "reasonable basis for a difference of opinion." Accordingly, applying the Windstorm Definition's ACC clause to the Policy as a whole, there is an ambiguity with respect to the Policy's Flood Exclusion.

II. The Policy's Ambiguity Cannot Be Resolved as a Matter of Law.

    *a. The Windstorm Definition's ACC Clause Does Not "Supersede" the Flood Exclusion's ACC Clause.*

Madelaine argues the Policy's ambiguity must be resolved in its favor as a matter of law because "when an endorsement potentially conflicts with other provisions of the policy, the plain language of the endorsement is controlling." Pl. Br., ECF No. 56-3, at 17-18 (citing Murphy v. Allied World Assur. Co., 2009 WL 1528527, at *2 (S.D.N.Y. May 29, 2009)). Madelaine's statement of the law is correct, but its application to the facts of this case is not.

It is a well-settled principle of contract interpretation that "separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated." Restatement (Second) Contracts § 203; see also JCD Int'l Gem Corp. v. Evanston Ins. Co., 1995 WL 491337, at *2 (S.D.N.Y. Aug. 17, 1995) ("where typewritten endorsements and printed standard contract language are in conflict, the typewritten endorsements, which are supposed to

13

reflect terms negotiated between the parties, should be given effect"). Indeed, in JCD Int'l, the court concluded that where language in a "printed policy" could not be reconciled with language in a later-negotiated, "typewritten endorsement," the latter should be given effect, absent some other contractual defense that might otherwise undermine the enforceability of the endorsement. JCD Int'l Gem Corp., 1995 WL 491337, at *2. However, where, as here, there is no evidence in the record that the Windstorm Endorsement was "separately negotiated," the principle does not apply. To the contrary, the operative Policy produced during discovery indicates the Windstorm Endorsement had already been incorporated at the time the Policy was executed by the parties, which counsel for Great Northern confirmed during Oral Argument. ECF No. 56-5; June 17, 2019 Oral Argument Tr. 26:6-10. Therefore, where one provision is executed simultaneously with a conflicting provision, the former does not supersede the latter just because it is styled as an "endorsement." As a result, the Windstorm Definition's ACC clause does not "supersede" the Flood Exclusion's ACC clause and resolve the Policy's ambiguity in Madelaine's favor.

  b. *Extrinsic Evidence Reveals a Triable Issue of Fact.*

Having concluded there is an ambiguity, the Court is permitted to consult extrinsic evidence of the parties' intent to aid its interpretation of the Policy. Curry Rd. v. K Mart Corp., 893 F.2d 509, 512 (2d Cir. 1990) ("Because an ambiguity is present in the relevant provisions of the lease, the parties are entitled to present extrinsic evidence of intent"). The Court will "look to the acts and circumstances surrounding the execution of the ambiguous terms to ascertain the parties' intent," Roberts v. Consolidated Rail Corp., 893 F.2d 21, 24 (2d Cir. 1989), as well as "evidence of the parties' subjective intent," Walk-In Medical Ctrs. v. Breuer Capital Corp., 818 F.2d 260, 264 (2d Cir. 1987); see also SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC., 467 F.3d 107, 126 (2d Cir. 2006) ("At least with respect to a negotiated agreement, a party's

subjective understanding, while not controlling, may shed light on the state of those negotiations and could bear on that party's objective actions"); Tokio Marine & Fire Ins. Co., Ltd. v. McDonnell Douglas Corp., 617 F.2d 936, 940 (2d Cir. 1980) (noting "proof concerning the subjective intent of the parties" would have been permissible if contract was ambiguous); Constellation Power Source, Inc. v. Select Energy, Inc., 467 F. Supp. 2d 187, 209 (D. Conn. 2006) ("The better reading of New York law, and certainly the Second Circuit's interpretation of New York law on this point, is that extrinsic evidence of subjective intent is admissible if a contract term is ambiguous"). Only where there is no relevant extrinsic evidence of the parties' intent, or the extrinsic evidence is so one-sided, is summary judgment warranted.

Madelaine points to evidence in the record suggesting (i) it "always understood that it possessed windstorm protection because the Policy contained a Windstorm Endorsement," Pl. Br., ECF No. 56-3, at 21, (ii) the Flood Exclusion was limited to a "Noah's Ark" catastrophic flood event, id. at n.25, (iii) Great Northern underwriters were directed to "avoid" underwriting coverage in "locations within storm surge areas," because, Madelaine surmises, Great Northern knew windstorm damage was covered regardless of *any other* concurrent or contributing cause, id. at 22, and (iv) Great Northern "simply described" the Windstorm Definition in the Windstorm Endorsement in a memorandum submitted to the New York Insurance Department rather than "include the impact the change has on the scope of the provision or scope of insurance provided," which, Madelaine again surmises, indicates the addition of the Windstorm Definition could have a "variety of effects," including expanding the scope of coverage, id. at 23. Ultimately, Madelaine argues that the available extrinsic evidence does not support an interpretation of the Policy that would foreclose coverage, and as a result, the doctrine of *contra proferentem* applies and the Court must resolve the Policy's ambiguity in its favor. Id. at 24.

On the other hand, Great Northern proffers evidence to suggest (i) Madelaine knew the Policy excluded flood damage because Madelaine procured a separate National Flood Insurance Program policy to cover what the Great Northern Policy did not—flood damage regardless of any other concurrent or contributing cause, Def. Br., ECF No. 57-1, at 18-21, (ii) Madelaine "knew that flood was not a risk that [it] could afford to pay extra for" under the Great Northern Policy, id. at 19, and (iii) the absence of any specific or explicit communication between the parties discussing the meaning of the Windstorm Definition indicates that neither party saw the Windstorm Definition's ACC clause as impacting the Policy's scope of coverage, id. at 18, 21.

Clearly, the parties draw conflicting conclusions from the limited extrinsic evidence, neither of which are, as a whole, so *in*credible that the Court must find one side is entitled to summary judgment. A single witness's testimony that the Flood Exclusion is limited to a "Noah's Ark" event is a credibility issue for the factfinder, to be reconciled with the somewhat conflicting testimony that Madelaine "knew that flood was not a risk that [it] could afford to pay extra for." Moreover, avoiding locations within storm surge areas when underwriting windstorm coverage does not unmistakably mean that windstorm damage is *always* covered, and just because the Windstorm Definition was "simply described" in a memorandum to the New York Insurance Department, and "can have" a "variety of effects," does not indisputably expand coverage and supersede otherwise applicable exclusions. Finally, the purchase of secondary flood insurance does not unequivocally indicate that flood coverage under Madelaine's primary insurance policy did not already exist. The available extrinsic evidence is far from overwhelming; however, this is not an instance where it is so one-sided or so scarce that a reasonable factfinder could only find for one party. Accordingly, the extrinsic evidence reveals

triable issues of fact and the Court need not resort to the doctrine of *contra proferentem* to resolve the Policy's ambiguity as a matter of law.

## CONCLUSION

The parties' cross-motions for summary judgment are denied. Applying the Windstorm Definition to the Policy's coverage-granting clauses creates an ambiguity with respect to the Policy's flood exclusion and the available extrinsic evidence reveals triable issues of fact.

SO ORDERED.

Dated: Brooklyn, New York
       July 18, 2019

                                              s/Raymon J. Dearie
                                              _____
                                              RAYMOND J. DEARIE
                                              United States District Judge